**MUTUAL SHARES CORPORATION,**
**Spingarn Heine & Co., and Norte**
**& Co., Plaintiffs-Appellants,**

v.

**GENESCO, INC., and W. Maxey Jarman,**
**Defendants-Appellees.**

**No. 405, Docket 31123.**

United States Court of Appeals
Second Circuit.

Argued April 13, 1967.

Decided Aug. 14, 1967.

Moore, Circuit Judge, dissented in part.

William Klein, II, New York City (Julius J. Rosen, New York City, on the brief), for plaintiffs-appellants.

Breck P. McAllister, New York City (Donovan, Leisure, Newton & Irvine, James R. Withrow, Jr., Richard L. Bond, Sanford M. Litvack, New York City, on the brief), for defendants-appellees.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Edward B. Wagner, Sp. Counsel, Martin D. Newman, Atty., Washington, D. C., for Securities and Exchange Commission as amicus curiae.

Before MOORE, SMITH and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

We are again faced here with a claim that alleged misconduct affecting holders of publicly-owned securities violated the Securities Exchange Act of 1934 ("the Act") and Rule 10b–5 issued thereunder by the Securities and Exchange Commis-

sion. The complaint of plaintiffs Mutual Shares Corporation ("Mutual"), Spingarn Heine & Co. and Norte & Co., in the District Court for the Southern District of New York alleges violations of the Act and of state law by defendants Genesco, Inc. and W. Maxey Jarman. Judge Bonsal dismissed the complaint for lack of jurisdiction, holding that there was neither a federal question nor complete diversity of citizenship. Plaintiffs appeal from that order;[1] for reasons more fully set forth below, we affirm in part and reverse in part.

## I

According to the complaint or undisputed matters of record, the relevant facts are as follows: Mutual is a publicly-held, open-end investment company; Spingarn Heine & Co. is a brokerage firm with a partner who is a vice president, director and stockholder of Mutual; and Norte & Co. is the registered nominee of Mutual's investment adviser. For diversity purposes all plaintiffs are citizens of New York. Defendant Genesco, Inc. is a large manufacturing and retailing concern, and Jarman is its chairman and principal stockholder. Both defendants are citizens of Tennessee for diversity purposes. Not named as a party, but at the center of the suit, is S. H. Kress and Company, a New York corporation which operates more than 250 variety stores in many states throughout the country.[2]

Between July and October 1963, Genesco acquired 94.1 per cent of the outstanding stock of Kress, 43 per cent by purchase from the Kress Foundation, and the rest from the public through tender offers. By the time the amended complaint was filed in November 1966, Genesco had increased its holdings to 94.6 per cent of Kress. The complaint alleges

that the stock was obtained pursuant to "a fraudulent conspiracy" to acquire control of Kress, use Kress's own property to finance the acquisition and then manage Kress and appropriate its assets for Genesco's sole benefit. Appellants claim that defendants euchred them into buying 16,608 shares of Kress stock, which they still own and have continued the fraud by operating Kress against its corporate interest to the minority shareholders' detriment.

Stripped of its pejoratives and redundancies, the complaint alleges fraudulent activities falling essentially into two time periods—before and after plaintiffs acquired their stock. The fraud attributed to defendants in the period before plaintiffs became Kress stockholders—November 15, 1963 for Mutual, November 20, 1963 for Norte, and August 1964 for Spingarn—may be summarized as follows: In their tender offer for the stock of Kress, defendants failed to disclose (1) that Kress's real estate was worth substantially more than its financial statements indicated, and (2) their intention, after gaining control of Kress, to sell this real estate to Genesco's pension fund for an inadequate consideration, thereby raising the funds necessary to pay for the Kress stock acquisition, and otherwise to manage Kress for the sole benefit of Genesco. The fraud attributed to defendants after the dates when plaintiffs became Kress stockholders is that defendants financed their acquisition of Kress stock with Kress's own assets, have dominated Kress and run it in the interest of Genesco rather than Kress, including diversion of assets to Genesco, and have manipulated the market price of Kress stock, in part by keeping the Kress dividends to a minimum, in order to acquire shares of Kress's minority stockholders at less than the true value.

---

1. Plaintiffs also appeal from a denial by Judge McLean of their motion for a preliminary injunction. The appeal from Judge McLean's order is untimely, since it was filed long after the thirty-day period had expired. Fed.R.Civ.P. 73(a). This is a jurisdictional defect. Guido v.

Ball, 367 F.2d 882 (2d Cir. 1966) (per curiam); see Vine v. Beneficial Fin. Co., 374 F.2d 627, 632 (2d Cir. 1967).

2. Also submitting a brief as *amicus*, at our request, is the Securities and Exchange Commission.

Plaintiffs seek damages as well as injunctive relief, including a prayer relating to the alleged manipulative scheme that defendants be barred from further purchases of Kress stock, which are allegedly still continuing. Judge Bonsal held that the complaint did not state a federal cause of action under various sections of the Act or Rules thereunder and that Kress, a New York corporation, was an indispensable party-defendant whose presence would destroy the requisite diversity of citizenship for adjudication of state law claims. On appeal, plaintiffs claim that both grounds of the district court's decision were incorrect; we turn first to the federal law issues.

### II

The complaint bases the federal claims on section 10(b) of the Act and Rule 10b–5 thereunder [3] and section 14(a) of the Act and Rule 14a–9; [4] the latter, which deal with proxy statements, will be discussed hereafter.[5] Section 10 of the Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> \* \* \* \* \* \*
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 of the Commission provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

Section 10(b) and Rule 10b–5 have been the focal point for a spectacular growth in the law governing civil liability for transactions in securities.[6] This has been all the more remarkable because the Act does not explicitly provide a private civil remedy for violations of the section and Rule, and the Supreme Court has never held that one exists, although J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), impliedly suggests that it does. Nevertheless, it is now common ground that an injured investor does have a private cause of action under Rule 10b–5, e. g., Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951). However, various concepts have been utilized to limit liability under the sweeping language of the Rule, although none is specifically required by it. 3 L. Loss, Securities Regulation 1763–67 (2d ed. 1961). Thus, a requirement of privity was at first suggested, see Joseph v.

---

3. 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.-10b–5 (1964), respectively.

4. 15 U.S.C. § 78n(a) (Supp.1966) and 17 C.F.R. § 240.14a–9 (1964), respectively.

5. Appellants also claimed below that section 18(a) of the Act, 15 U.S.C. § 78r(a), was violated; the contention has apparently been abandoned in this court.

6. Contrast generally Ruder, Pitfalls in the Development of a Federal Law of Corporations by Implication Through Rule 10b–5, 59 Nw.U.L.Rev. 185 (1964), with Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146 (1965).

Farnsworth Radio & Television Corp., 99 F.Supp. 701 (S.D.N.Y.1951), aff'd per curiam, 198 F.2d 883 (2d Cir. 1952),[7] but has more recently been ignored, e. g., Cochran v. Channing Corp., 211 F.Supp. 239, 243–245 (S.D.N.Y.1962); see Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y.1964).[8] However, the search for limiting doctrine has continued.[9] Thus, some courts have looked to see whether a plaintiff actually relied on the allegedly fraudulent statement,[10] whether such reliance was reasonable,[11] whether the fraud actually caused the harm to plaintiff,[12] whether the plaintiff's injury was foreseeable,[13] and whether plaintiff falls within the category of a buyer or seller of securities.[14]

In the face of the broad language of Rule 10b–5 and the measured judicial treatment of it, it is most important to ascertain precisely the theory upon which plaintiffs sue. In this court, appellants' principal claim under Rule 10b–5 is that defendants "deceived [them] into buying Kress shares which they would not have bought had they known the facts," and that this fraud arose "in connection with Genesco's purchase of Kress shares." The alleged deceit was defendants' silence as to their true fraudulent intentions and the actual value of Kress's real estate. In other words, appellants claim that the maker of a tender offer to purchase the stock of a corporation can by silence violate a duty under the Act to plaintiffs even though he and they are both strangers to the corporation.

Use of a tender offer by an outsider to obtain control of a publicly-held corporation is a fairly recent development. This means of corporate takeover has become increasingly popular,[15] and has led to demands for legislative regulation to prevent abuses. Bills have been introduced in Congress designed to achieve this end.[16] While not conclusive, this legislative activity at least indicates the conviction of many that existing statutes do not adequately cover the field. Indeed, the chairman of the Commission has stated, albeit not in his official capacity, that "the bills now pending before Congress would fill a hiatus." [17]

It is against this background that we must consider appellants' claim that Rule 10b–5 now affords them a remedy on the facts they have alleged. Significantly,

---

7. But see Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951), discussed in Note, Civil Liability Under Rule 10b and Rule 10b–5: A Suggestion for Replacing the Doctrine of Privity, 74 Yale L.J. 658, 661–67 (1965).

8. See Note, Civil Liability, supra note 7, at 661–67.

9. See generally Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5, 65 Colum.L.Rev. 1361 (1965).

10. List v. Fashion Park, Inc., 340 F.2d 457, 462–463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

11. Id. ("materiality" requirement); accord Rogen v. Ilikon Corp., 361 F.2d 260, 266–267 (1st Cir. 1966).

12. E. g., Barnett v. Anaconda Co., 238 F.Supp. 766, 776 (S.D.N.Y.1965). But see Weber v. Bartle, 272 F.Supp. 201 (S.D.N.Y. March 20, 1967).

13. See, e. g., Vine v. Beneficial Fin. Co., 374 F.2d 627, 635 (2d Cir. 1967).

14. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). But see Comment, Private Enforcement Under Rule 10b–5: An Injunction for a Corporate Issuer?, 115 U.Pa.L.Rev. 618 (1967); cf. A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 n. 3 (2d Cir. 1967); Vine v. Beneficial Fin. Co., 374 F.2d 627, 636 (2d Cir. 1967).

15. See generally Fleischer & Mundheim, Corporate Acquisition by Tender Offer, 115 U.Pa.L.Rev. 317 (1967); Comment, The Regulation of Corporate Tender Offers Under Federal Securities Law: A New Challenge for Rule 10b–5, 33 U.Chi. L.Rev. 359 (1966); cf. Symington Wayne Corp. v. Dresser Indus., Inc., 383 F.2d 840 (2d Cir. 1967).

16. See Fleischer & Mundheim, supra note 15, at 323 & nn. 28, 29 and passim.

17. Cohen, A Note on Takeover Bids and Corporate Purchases of Stock, 22 Bus. Law. 149, 156 (1966).

defendants made no tender offer to appellants to buy their Kress stock. Indeed, appellants did not sell Kress stock to defendants or to anyone; they purchased Kress stock instead. As to the "hidden" value of the real estate, appellants do not allege that defendants had any information when the tender offers were made that was not equally available to other members of the public. As Judge Bonsal pointed out with regard to this "fraud," appellants benefited by purchasing their stock at allegedly depressed prices, if their allegations are to be believed. As to the concealed intention to misuse Kress, plaintiffs do not allege a misrepresentation, but failure to disclose by an outsider.[18] At best, this claim under Rule 10b–5 is that defendants impliedly represented to the world at large that they would not mismanage Kress if they acquired control and that plaintiffs relied on this when they bought their Kress stock. Plaintiffs cite no cases in which the Rule has been applied in this expansive manner, nor have we been able to find any. A tender offer by outsiders was involved in Mills v. Sarjem Corp., 133 F.Supp. 753 (D.N.J.1955), but the case points the other way. Id. at 764–765. There was an outsider tender offer in Moore v. Greatamerica Corp., 274 F. Supp. 490 (N.D.Ohio 1967), which did grant temporary injunctive relief on a claim of violation of Rule 10b–5. However, plaintiffs there were stockholders, to whom the offer was addressed, and the corporation whose stock was sought; moreover, the offer allegedly contained an affirmative representation. Finally, any stockholder could plausibly argue that at the time of purchase he relied on an implied representation by management not to mismanage. Therefore, as the Commission's *amicus* brief points out, if plaintiffs' proposition were accepted, it would convert any instance of corporate mismanagement into a Rule 10b–5 case. See Lester v. Preco Indus., Inc. [1964–1966 Transfer Binder] CCH Fed.Sec.L.Rep. ¶¶ 91,562, 91,605 (S.D. N.Y.1965). We regard such a result as unjustified.

Under all of these circumstances, we refuse to hold that these plaintiffs have a right to sue under Rule 10b–5 for the alleged fraud in connection with their purchase of Kress stock; we express no general view as to the rights of stockholders to whom an outsider makes a tender offer. In their reply brief, plaintiffs rely heavily on Vine v. Beneficial Fin. Co., 374 F.2d 627 (2d Cir. 1967), decided well after they brought their suit in the district court. But that case is far different from this. For example, the offer to stockholders there was made by insiders; plaintiff Vine was a member of the class to whom the offer was specifically addressed;[19] and the issue decided was whether Vine was an involuntary "seller" because the corporation in which he owned stock had been dissolved, leaving him only with shares which had been converted into a claim for cash. Plaintiffs also tangentially refer to the alleged continued "deception" by defendants after they became insiders, implying that this contributed to plaintiffs' decision to purchase stock. The tender offers, which had been made from July 1963, ended a few days after defendants took control of Kress in October. That for this very brief period the offer was technically continued by insiders is not

---

18. Defendants are alleged to have made one affirmative misrepresentation—that there would be no changes in Kress management. Amended complaint ¶¶66, 67. But as plaintiffs immediately thereafter show, ¶68, see ¶¶78, 80, 82, defendants did exactly the opposite before plaintiffs purchased any stock. With the public appointment of Jarman as Chairman, Director and member of the Kress Executive Committee and the replacement of a majority of the Kress board, prior to plaintiffs' purchases, Judge Bonsal found that they could not have relied on this alleged misrepresentation. We agree.

19. These facts also distinguish Voege v. American Sumatra Tobacco Corp., 241 F. Supp. 369 (D.Del.1965); cf. Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951) (alleged fraudulent statements by insiders regarding preferred stock intended to induce purchases of common as well as preferred actionable by purchasers of both).

significant here, since it is clear that plaintiffs relied, if at all, on the fact that Genesco made tender offers in the first place, when defendants were clearly still outsiders. For this and other reasons discussed above, defendants' activities prior to the time when plaintiffs purchased their stock gave rise to no valid federal claim by plaintiffs.

## III

We turn now to the period after plaintiffs became Kress stockholders; the fraudulent activities then alleged are primarily corporate abuse and diversion, claims cognizable under state law but not under the Act.[20] However, the complaint does charge that in this later period defendants manipulated the market price of Kress stock, keeping Kress dividends to a minimum, in order to force minority stockholders to sell out to Genesco at depressed values. While not highlighted in this court,[21] the contention that this states a claim under Rule 10b–5 is substantial. Controlling stockholders have a duty not to take advantage of the minority in purchasing the latter's shares. See Speed v. Transamerica Corp., 99 F.Supp. 808, 828–829 (D.Del.1951). In Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962), it was held that manipulation of market price and purposeful reduction of dividends in order to buy out minority stockholders cheaply was actionable under Rule 10b–5, at least under subdivisions (1) and (3) thereof.[22] Moreover, this court referred approvingly to that holding in O'Neill v. Maytag, 339 F.2d 764, 768 (2d Cir. 1964), stating that:

20. We have been informed of two such suits, instituted in state courts prior to the filing of this suit by other Kress shareholders. Miller v. Blackie, Index No. 9539—1964 (Sup.Ct., N.Y. County); Gluck v. Jarman, Index No. 12407—1964 (Sup.Ct., Kings County).

21. Appellants' main brief on appeal bases federal question jurisdiction only on the alleged deception which induced them to purchase Kress stock. It was not until the Commission suggested in its *amicus* brief that defendants' activities in the

In addition, deception may take the form of nonverbal acts: In Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962), it consisted of reducing dividends in order to drive down the price of the corporation's stock. And it need not be deception in any restricted common law sense; one of the central purposes of federal securities legislation would otherwise be seriously vitiated.

See also Hoover v. Allen, 241 F.Supp. 213, 227 (S.D.N.Y.1965). It is true that the plaintiff in *Cochran* had sold his shares at an alleged loss, while plaintiffs here still own theirs, so that it may be said, as defendants do, that plaintiffs have as yet sustained no monetary injury.[23] Moreover, plaintiffs' claim must, of course, find justification in the language of Rule 10b–5, which requires that any alleged damages be "in connection with the purchase or sale of any security." On this aspect of the case, the only transactions in securities that plaintiffs could refer to would be defendants' purchases of stock from other Kress stockholders at depressed prices; as the Commission brief points out, the causal connection between these and any alleged existing damage to plaintiffs is slim indeed.

But we do not regard the fact that plaintiffs have not sold their stock as controlling on the claim for injunctive relief. The complaint alleges a manipulative scheme which is still continuing. While doubtless the Commission could

later period might violate Rule 10b–5 that appellants clearly made that contention to us in a reply to the Commission brief.

22. But cf. Israels, Corporate Purchase of Its Own Shares—Are There New Overtones?, 50 Cornell L.Q. 620, 625 (1965), referring to the argument that the Rule is broader than the statute permits.

23. Compare Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965) (plaintiffs sold stock at a loss 5 months after alleged fraud).

seek to halt such practices,[24] present stockholders are also logical plaintiffs to play "an important role in enforcement" of the Act in this way. See Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966); 3 L.Loss, Securities Regulation 1795–96 (2d ed. 1961). Injunctive relief was considered proper in Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964), to restrain the "sale" of treasury stock by a corporation on the theory that the corporation was a "seller" under Rule 10b–5 although the sale was not yet consummated. See also Moore v. Greatamerica Corp., 274 F.Supp. 490 (N.D. Ohio 1967). Deceitful manipulation of the market price of publicly-owned stock is precisely one of the types of injury to investors at which the Act and the Rule were aimed. Since private parties have the right to sue for violation of the Rule, the broad remedial purposes of the Act suggest that the judicial relief available should not be limited to a particular type of remedy. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Moreover, as already indicated, the claim for damages on this theory founders both on proof of loss and the causal connection with the alleged violation of the Rule; on the other hand, the claim for injunctive relief largely avoids these issues, may cure harm suffered by continuing shareholders, and would afford complete relief against the Rule 10b–5 violation for the future.[25] "It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages." See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. at 193, 84 S. Ct. at 283. We, of course, do not know whether plaintiffs can prove their allegations. However, we hold that they have stated a claim under the Act and Rule 10b–5 for injunctive relief to prevent defendants from depressing the price of Kress stock by market manipulation or otherwise;[26] insofar as the trial court dismissed any claim for damages for a violation of Rule 10b–5, it was correct.

■ Moreover, the remaining alleged federal claims for damage were similarly disposed of properly. As indicated above,[27] the argument that section 18(a) of the Act was violated has not been pressed here. In this court, plaintiffs do also contend that a fraudulent proxy statement and a misrepresentation at the Kress annual meeting in the spring of 1964 entitled them to relief under section 14(a) of the Act and Rule 14a–9. However, Judge Bonsal's finding that plaintiffs "had purchased substantially all of their Kress shares" before the alleged misrepresentations were made is unchallenged on appeal. We therefore agree with his conclusion that these claims are "frivolous" because plaintiffs could show no reliance on the alleged fraud.

Since we hold that a federal question exists, we express no opinion on whether Kress is an indispensable party, which would destroy diversity jurisdiction. It will be more appropriate for the district court on remand first to consider, on the

---

24. Compare SEC v. Georgia-Pacific Corp., No. 66 Civ. 1215 (S.D.N.Y., filed Apr. 27, 1966), where the Commission charged that defendants manipulated the company's stock in order to raise its price so that less shares would be required for certain acquisitions [1964–1966 Transfer Binder] CCH Fed.Sec.L.Rep. ¶91,680 (excerpts from complaint). The action ended with a consent injunction, id. ¶91,692 (S.D.N.Y.1966).

25. Such cases as Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201 (S.D.N.Y.1964), and Kremer v. Selheimer, 215 F.Supp. 549 (E.D.Pa.1963),

relied on by the trial court, did not involve injunctive relief.

26. The Commission's *amicus* brief suggests that plaintiffs did not request that defendants be enjoined from continuing their manipulative activities. Since the complaint alleges fraudulent market manipulation designed to affect the price of Kress stock and requests, *inter alia*, that defendants be enjoined from purchasing Kress stock, we regard the Commission's interpretation as an over-literal reading of the complaint.

27. See note 5, supra.

basis of the proceedings then before it, whether the remaining causes of action alleging violations of state law are pendent to the now limited federal claim. See United Mine Workers v. Gibbs, 383 U.S. 715, 721–729, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Bartle v. Markson, 357 F.2d 517, 522–523 (2d Cir. 1966); cf. T. B. Harms Co. v. Eliscu, 339 F.2d 823, 823–829 (2d Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). See generally Lowenfels, Pendent Jurisdiction and the Federal Securities Acts, 67 Colum.L.Rev. 474 (1967). We remand the matter to the district court for proceedings consistent with this opinion.

MOORE, Circuit Judge (dissenting in part):

A glance at the amended complaint reveals that plaintiffs, namely, a corporation and two partnerships, are owners of common stock of S. H. Kress and Company (the shares of which were traded on the New York Stock Exchange). Their shares were acquired between November 15, 1963 and August 17, 1964. This is not a class action. Plaintiffs do not purport to represent or to champion other stockholders than themselves.

The relief sought, however, asks that (a) the defendants, Genesco and its Board Chairman, Jarman, pay to plaintiffs "and the other minority stockholders of S. H. Kress and Company the fair value of their pro rata share of the uses of the business, assets and credit of S. H. Kress and Company wrongfully made by defendants." (Kress, the assets of which plaintiffs would distribute pro rata to other stockholders whether they desired to be recipients or not, is not even a party to the action); (b) defendants distribute to plaintiff and the minority stockholders their pro rata share of the assets of Kress—in other words liquidate Kress at their behest regardless of the wishes or welfare of the other stockholders; and (c) while awaiting such dismemberment that defendants be enjoined from (i) purchasing Kress stock, (ii) issuing any public report or statement except along the lines conceived by plain-

tiffs, (iii) using an alleged sum of $72,-000,000 for the acquisition of an "other firm or corporation", and (iv) deriving any benefit from the assets of Kress; and (d) fees to plaintiffs' attorneys.

In short, plaintiffs, as owners of 16,-608 shares of Kress out of 2,322,738 outstanding (April 18, 1966), ask the court by affirmative injunction, in effect, to usurp managerial powers and override the votes of 2,306,130 shares.

The extremes to which plaintiffs go in allegations and argument are the best refutations to their asserted positions. Were there any fraud practiced on stockholders who had tendered their stock, the Securities and Exchange Commission in its *amicus* brief has a succinct answer: "Here plaintiffs were not injured by any fraud allegedly practiced on the Kress stockholders who accepted the tender offer; plaintiffs were not even Kress stockholders at the time of that alleged fraud" (p. 7).

I agree with the law as stated in Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y., 1962) that manipulation of security prices whether by purposeful depression of dividends or by unlawful market maneuvers is actionable but plaintiffs do not allege that they sold their shares or suffered any loss as a result of such practices, even assuming they occurred. As the Commission (in its brief) stated "in respect to these activities [market depression] plaintiffs are neither buyers nor sellers of securities," and since "the only transactions in securities which plaintiffs refer to in this connection are the defendants' possible purchases of Kress shares from other Kress shareholders at depressed prices," plaintiffs in this suit by injunction or otherwise have no right or standing to dictate to other stockholders what they should do with their stock. If such stockholders choose to sell and thereby should sustain damages, they still retain the right to sue, if they believe that they have been defrauded, or to stay out of the law courts if their peace of mind is best maintained by such abstention. The Commission recognizes that "such purchases have no

sufficient causal connection with any injury which plaintiffs claim to have suffered" (Br. p. 8).

In stating that plaintiffs have a claim for injunctive relief, the majority are forced to turn this action, in effect, into a class or derivative action, which it is not, to "cure harm suffered by continuing stockholders." Were this so, Kress would appear to be an indispensable party. If plaintiffs have been made the victims of "[d]eceitful manipulation of the market price," they should pursue their claim for damages, if any. But it is scarcely appropriate for the judiciary by mandatory injunctive decree to decide at the behest of three stockholders what the corporate dividend policy of Kress should be or that a stockholder other than themselves should be deprived of his supposedly constitutional right to sell his stock to Genesco if his judgment so dictates. Courts should stand ready to redress wrongs suffered by plaintiffs who allege and prove that they have been damaged thereby but not, by the device of an exercise of injunctive powers to go beyond this role.

I would affirm the judgment in its entirety.